**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Richard L. WESTON and Drucilla Merida Thompson, Defendants-Appellants.**

**Nos. 82–1545, 82–1863.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1983.

Decided May 25, 1983.

---

Steven R. Levin, Chicago, Ill., for defendants-appellants.

Paula E. Lopossa, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before PELL and BAUER, Circuit Judges, and GRAY, Senior District Judge.*

PELL, Circuit Judge.

Defendant Richard Weston was convicted of interstate transportation of stolen property and defendant Drucilla Merida Thompson was convicted of aiding Weston in transporting the property. Defendants were jointly represented at trial by one attorney. Defendants waived any conflicts of interest that might arise from joint representation but now claim that they were

---

* William P. Gray, Senior District Judge for the Central District of California, is sitting by designation.

denied the effective assistance of counsel by their attorney's actual performance, which they claim fell below the minimum required level of professional representation to which they were entitled. In support of this claim they point to several instances in which counsel allegedly failed to provide adequate representation.

## I. Facts.

On July 6, 1981, William and Linda Stevenson were robbed in their home in Bethel, Ohio. After the robbery the Stevensons, their son, and Mr. Stevenson's brother-in-law were found shot to death in the house. Jewelry, including a diamond ring, cash, and a .44 Magnum revolver were taken from the Stevensons' home.

Carol Thompson, daughter of the Stevensons, testified that she had seen defendant Weston and a metal dealer named Ron Thomas in her parents' home the evening before the murders. At the time of the robbery defendants were living with Janice Freeman in Indiana. Freeman testified that Weston left the house on the afternoon of July 5 and did not return until the next morning. During Weston's absence Drucilla Thompson seemed nervous. When Weston returned to Freeman's home he showed the women a large amount of cash, a diamond ring and a revolver, items which were later identified by Carol Thompson as having belonged to her parents.

During the evening of July 7 Weston, in the presence of Drucilla Thompson, told Freeman that he had gone to Ohio and robbed the Stevensons. Both defendants asked Freeman for a shovel and, when Freeman said that she did not have one, asked where one could be purchased. The next day defendants returned from an outing and presented Freeman with a shovel. Several days later defendants purchased a pick-up truck from a neighbor, paying $5,000 in cash. Defendants attempted to convince Freeman to say that they had not gone anywhere on July 5 or 6 if asked.

Agents of the Federal Bureau of Investigation (FBI) arrested Weston on July 14 and began trailing Thompson. During this period Thompson frequently drove with Freeman to an area known as Tunnel Road. On one occasion Thompson pointed to a particular spot and stated, "that's where the money and rings are buried." FBI agents later exhumed a plastic garbage bag from this area. The plastic bag contained a duffel bag bearing the name R. Weston, a large amount of cash, Mrs. Stevenson's diamond ring and the revolver taken during the robbery. Also found in the duffel bag were various personal items belonging to Weston and a money wrapper bearing Weston's fingerprints. Weston was charged with interstate transportation of the diamond ring.

Prior to trial, defense counsel made an oral motion to bar the introduction of evidence relating to the robbery and killings at the Stevenson residence. The court granted the motion with respect to the killings but ruled that evidence of the robbery was admissible to prove defendants' knowledge that the ring was stolen.

## II. Alleged Ineffective Assistance of Counsel.

Defendants complain that their attorney, having obtained protection from the prejudicial impact knowledge of the murders would have on the jury, failed to preserve the jury's impartiality by mentioning the murders several times himself. The first instance occurred during cross-examination of Carol Thompson, who identified Weston as one of two men present in her parent's home the night before the robbery. During cross-examination defendants' counsel, after referring to a statement Thompson previously gave to the FBI, asked her, "Didn't you make a statement on July 6th or 7th to members of the FBI and officials of the Clermont County that you were unable to provide any suspects for these murders?"

The second instance also arose during cross-examination of Carol Thompson. Defense counsel brought out that Thompson lied to the FBI about the existence of three rings that belonged to her mother. On redirect examination the Government elicited the reason for Thompson's lie. The rings

had been removed from her mother's hand by the funeral director and Thompson concealed their existence to avoid having them sold along with the rest of the estate. Defendants claim that counsel should have foreseen that impeachment of Thompson in this manner would open the door to rehabilitation by the Government, and that statements supplied to counsel should have alerted him to the fact that rehabilitation of Thompson would reveal Mrs. Stevenson's death.

The third instance occurred during defense counsel's questioning of FBI Agent Russo. In questioning Russo about an interview with Carol Thompson, counsel referred to the "alleged crimes in Ohio." Defendants contend that use of the plural "crimes" reinforced previous references to the murders. The final mention of the murders came during interrogation of Mary Deaton, who sold the pick-up truck to defendants. Counsel read into evidence Deaton's prior statement to the effect that Weston offered a gun as part payment for the truck, and that when Deaton refused the gun because it might have been used to kill somebody Weston reacted by looking at her in a strange manner.

Defendants also complain that counsel's performance fell below the required minimum level of competence in several other respects, including counsel's failure to object to the introduction of the revolver and his failure to impeach Government witnesses properly. Defendants urge that these faux pas, coupled with counsel's repeated references to the murders, deprived them of the effective assistance of counsel.

■ In this circuit the measure of an ineffective assistance of counsel claim is whether defendant received "legal assistance which meets a minimum standard of professional representation." *United States ex rel. Williams v. Twomey,* 510 F.2d 634 (7th Cir.1975), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109. This standard applies whether counsel is appointed or retained. *Id.* at 640. A "minimum standard of professional representation" guarantees a defendant reasonably effective counsel,

not errorless counsel. Given the pressures of trial and the myriad of quick decisions that must be made by counsel, and that even the most gifted attorney is fallible, occasional erroneous representation is not unlikely. Recognition of this led us to hold that there is no presumption of deprivation of constitutional rights "merely because defendant's attorney . . . makes egregious errors, tactical or strategic, in preparation, in conference, in examining witnesses." *Id; see also Wade v. Franzen,* 678 F.2d 56 (7th Cir.1982); *United States v. Bosch,* 584 F.2d 1113 (1st Cir.1978).

■ To prove a claim of ineffective assistance of counsel a defendant must demonstrate that counsel provided representation amounting to "grossly incompetent professional conduct" or "representation which is in any aspect . . . shockingly inferior to what may be expected of the prosecution's representation." 510 F.2d at 640. In reviewing an attorney's performance we are not free to second-guess his legitimate tactical decisions. With the benefit of hindsight one can always identify weaknesses in an unsuccessful attorney's strategy, but such errors do not amount to ineffective assistance of counsel. Rather, we will only examine those blunders not classifiable as an attorney's tactics and determine whether they amount to grossly unprofessional conduct.

■ In judging counsel's conduct "[m]uch depends on the nature of the charge, of the evidence known to be available to the prosecution, of the evidence susceptible of being produced at once or later by the defense, and of the experience and capacity of defense counsel." *Twomey, supra,* at 639. This determination, of necessity, takes into account the extent to which counsel's errors may have prejudiced defendant's case. Counsel may inexcusably fail to object to certain evidence or fail to follow court procedures properly, but do no harm to defendant's case. Such a mistake does not amount to ineffective representation as counsel's efforts would have been no more effective in securing a favorable result even absent the mistake. See *Wade v.*

*Franzen,* 678 F.2d at 59; *United States v. Murzyn,* 631 F.2d 525 (7th Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981); *United States ex rel. Ortiz v. Sielaff,* 542 F.2d 377, 380 (7th Cir. 1976).

In this case defendants complain that their counsel prejudiced the jury against them by inadvertently injecting the murders into the trial. One of the complained of instances occurred when counsel opened the door to testimony revealing Mrs. Stevenson's death by impeaching Carol Thompson. The decision to impeach Thompson, who was a key Government witness, and risk the possible prejudice that knowledge of Mrs. Stevenson's death might cause is the type of tactical decision which, although questionable in retrospect, is not sufficient to meet the requirements of a determination of incompetence. Defendants have not demonstrated that the decision to impeach Thompson "resulted from neglect or ignorance rather than from informed, professional deliberation." *Marzullo v. Maryland,* 561 F.2d 540, 544 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978); *United States v. Bosch,* 584 F.2d 1113, 1121 (1st Cir.1978). Absent such neglect or ignorance, counsel's decision is not a basis for relief.

Two of the remaining instances in which the murders were indirectly referred to are hardly the type of mistake that amounts to ineffective assistance of counsel, assuming that they can be characterized as mistakes at all. Counsel's reference to "crimes" and his introduction of Mary Deaton's statement concerning the sale of the pick-up truck are so minor that it is difficult to believe that they made any impression upon the jury. The remaining instance, in which counsel referred to "murders" instead of "robbery" or "crime" during cross-examination of Carol Thompson, is a more serious mistake. Nevertheless, we do not believe that such a slip of the lip by counsel during the pressures of trial was so egregious as to warrant reversal. This is not a case in which counsel failed to appreciate the prejudicial impact inadmissible evidence would have on the jury and therefore took no steps to preserve the jury's impartiality. *See e.g. United States v. Bosch,* 584 F.2d 1113 (1st Cir.1978). Rather, that counsel misspoke through inadvertence, rather than through ignorance of the prejudice reference to the murders might cause, is shown by his successful pre-trial effort to bar introduction of evidence of the murders by the Government. Against this background, and viewing the record as a whole, we do not believe that that one misspoken word requires reversal.

Defendants' remaining contentions regarding counsel's performance also lack merit. Defendants argue that their counsel should have objected to introduction of the revolver found in Weston's duffel bag. As we shall discuss later, however, objection to admission of the gun would have been futile. Defendants' final claim that their counsel handled impeachment of Janice Freeman in a grossly incompetent manner is likewise unpersuasive. Although neither counsel's preparation nor his execution of cross-examination of Freeman are worthy of emulation, such ineptitude, in the absence of any demonstrated prejudice, did not deprive defendants of the minimum standard of professional representation to which they were entitled. Counsel impeached Freeman by eliciting that benefits had been given to her brother in exchange for her testimony. There has been no showing that further impeaching material was contained in Freeman's prior statements, or that defense counsel failed to peruse these statements in search of such material.

While counsel may not have done a stellar job of representing defendants, he did a more than adequate job of presenting their sole defense of alibi in the face of overwhelming evidence of their guilt. The mistakes counsel made did not deprive defendants of their right to the effective assistance of counsel.

*III. Admissibility of Evidence.*

Defendants argue that the court erred in allowing Carol Thompson to testify

that Mrs. Stevenson was dead and in admitting into evidence the gun taken from the Stevensons' residence that was later found in Weston's bag. In both instances defendants claim that the prejudicial impact outweighed the probative value of the evidence and that it should have been excluded under Rule 403, Fed.R.Evid. The balancing test mandated by Rule 403 is to be made by the trial judge, and a determination that the probative value of the proffered evidence outweighs its prejudicial impact can only be reversed for an abuse of discretion. *United States v. McManaman,* 606 F.2d 919, 926 (10th Cir.1979). We do not believe that the district court abused its discretion in admitting either piece of evidence.

The revelation that Mrs. Stevenson was dead was the direct result of defense counsel's impeachment of Carol Thompson. Counsel elicited that Thompson lied to the FBI and the Government was entitled to rehabilitate Thompson by having her explain the circumstances that led her to lie. It would have been impossible for Thompson to explain why she lied about her mother's rings without revealing her mother's death. The court weighed the possible prejudice this information might create against its clear probative value and correctly determined that Thompson should be allowed to explain her previous falsehood. Significantly, Thompson revealed only that Mrs. Stevenson was dead and not the manner of her death or the deaths of other members of the Stevenson household. We have previously recognized that limited evidence of a murder is admissible when needed to explain other evidence. *See United States v. Ostrowsky,* 501 F.2d 318 (7th Cir.1974) (evidence that car owner had been murdered by defendants admissible to prove that defendants knew car was stolen). In this case the court made an explicit determination that the evidence was admissible under Rule 403, and successfully limited the quantum of evidence concerning Mrs. Stevenson's death to that amount necessary to explain Carol Thompson's testimony.

Defendants now complain that the court erred in admitting the revolver found in Weston's duffel bag. Defense counsel did not object at trial, and we believe that any objection would have been futile. Defendants have cited cases that hold that admission of evidence concerning murder or possession of a weapon during trial on unrelated charges is reversible error. *See United States v. McManaman,* 606 F.2d 919 (10th Cir.1979); *United States v. Reid,* 410 F.2d 1223 (7th Cir.1969). In this case, however, the only evidence before the jury was that the gun was a collector's item, was taken from the Stevensons' house, was later offered by Weston as partial payment for the pick-up truck, and was found in Weston's duffel bag along with the missing diamond ring. The gun demonstrated that Weston was in possession of items taken from the Stevensons shortly after the robbery and placed these items in the duffel bag bearing his name. The countervailing possibility of prejudice, although existent, was minimal. Unlike those cases cited by defendants, the Government here did not indicate that the gun had any significance beyond demonstrating that the items were stolen from the Stevensons and transported by Weston. Although defense counsel inadvertently mentioned "murders" at one point in the trial, there was no indication that the murders were committed with a gun, or that this gun was ever used to commit a crime. In this situation the gun was properly admitted into evidence.

## IV. Sentencing of Weston.

After obtaining Weston's conviction the Government sought to enhance his sentence based on the claim that he was a dangerous special offender under 18 U.S.C. § 3575. A sentencing hearing was conducted during which the Government presented evidence that Weston met the statutory definition of "special offender." The Government also contended that the evidence presented at trial established that Weston committed the Stevenson murders and was therefore "dangerous" within the meaning of section 3575, which requires a finding that "a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant." 18 U.S.C. § 3575(e).

The court reviewed the evidence presented at trial, including evidence presented outside the presence of the jury, and found "by a preponderance of the evidence that the defendant was implicated in the robbery and murders of Billy F. Stevenson, his wife, son, and brother-in-law." In making this finding the court took into consideration trial testimony that implicated Weston in the robbery. The court also considered a statement given to the FBI by Janice Freeman, which was not introduced into evidence, that Weston was wearing a blood-stained shirt when he returned on the morning of July 6. No additional evidence concerning Weston's involvement in the murders was presented during the hearing. Based on Weston's part in the murders the court found him to be "dangerous" and sentenced him to 25 years imprisonment.

Defendant contends that the court's reliance upon the trial evidence deprived him of his statutory and constitutional right to confront witnesses against him on the issue of dangerousness. The Government contends that a trial court is granted wide discretion in conducting sentencing hearings and that defendant's opportunity to cross-examine witnesses at trial satisfied the demands of due process and the statute.

 The statute grants a defendant the right to "assistance of counsel, compulsory process, and cross-examination of such witnesses as appear at the hearing." The statute goes on to state that the court may enhance a defendant's sentence when "it appears by a preponderance of the information, including information submitted during the trial of such felony and the sentencing hearing and so much of the presentence report as the court relies upon, that the defendant is a dangerous special offender." Weston's statutory right to cross-examine witnesses extends only to those witnesses who appear at the hearing, and is further limited by the court's statutory perogative to consider trial evidence. Weston was not denied the right to cross-examine any of the witnesses who appeared at the hearing and was not denied any statutory right by the court's consideration of trial testimony.

The only remaining issue is whether the statute denied Weston due process in this case.

 It is clear that "before making [a sentencing] determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). Although sentencing under section 3575 may require greater procedural safeguards than sentencing based solely on the commission of an offense, *see Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) (sentencing under a statute that requires additional factual determination that defendant poses threat of harm to public invokes due process right to confront and cross-examine witnesses); *United States v. Schell*, 692 F.2d 672, 677 (10th Cir.1982) ("*Specht* certainly stands for the proposition that statutes like section 3575 must provide greater procedural protections than normally afforded defendants in sentencing proceedings."), we have held that even under section 3575 a sentencing judge may conduct a broad-based inquiry and consider hearsay testimony. *United States v. Inendino*, 604 F.2d 458, 464 (7th Cir.1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 276, 62 L.Ed.2d 190.

 In this case Weston was given the opportunity to cross-examine witnesses during the trial. Section 3575 clearly contemplated that this opportunity would satisfy the demands of due process should the Government elect not to present additional witnesses and stand on the trial testimony. To the extent that Weston was unable to cross-examine these witnesses effectively about the murders, rather than the robbery, during trial he was free to take advantage of section 3575's compulsory process provision and call these witnesses for further questioning at the hearing. That the Government chose to rely on the indirect evidence of Weston's involvement in the killings presented at trial rather than call witnesses who could testify without the

constraint of the court's pre-trial order barring mention of the murders did not deprive Weston of any constitutional rights. We note, additionally, that the evidence of Weston's involvement in the brutal slaughter of the Stevensons was more than enough to meet the preponderance of the evidence standard and we seriously doubt that a new hearing would produce a different result.

For the reasons stated herein, the convictions of defendants are AFFIRMED and defendant Weston's request for a new sentencing hearing is DENIED.